FILED

2010 Nov-16  PM 03:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **KEVIN PENN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-09-S-00203-NE** |
| | ) | |
| **USF HOLLAND, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff asserts claims against USF Holland, Inc., his current employer, under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq*. ("Title VII"), for disparate treatment, hostile work environment, and retaliation.[1]  Defendant has moved for summary judgment as to all of plaintiff's claims.[2]  Upon consideration of the parties' briefs and evidentiary submissions, the court concludes that defendant's motion for summary judgment is due to be granted. Plaintiff's motion to strike the report of defendant's expert will be denied as moot.[3]

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment "should

---

[1] *See* doc. no. 20 (Plaintiff's First Amended Complaint).

[2] Docs. no. 38, 39.

[3] Doc. no. 36.  The court did not have to consider the expert report of Caren Goldberg in ruling on defendant's motion for summary judgment.

be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves,* 52 F.3d at 921) (emphasis supplied). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II. SUMMARY OF FACTS

Plaintiff, Kevin Penn ("Penn"), is an African-American male ("black") who accepted a position as a "city driver" and occasional "dock worker" for defendant, USF Holland, Inc. ("Holland"), on November 26, 2005.[4]  Penn joined a union and became a bargaining unit employee.[5]  Holland is a regional transportation service provider that operates a terminal in Decatur, Alabama ("the Decatur Terminal").[6]  So-called "city drivers" transport freight from the customer's location to the local terminal, where that freight is unloaded by dock workers and combined with other freight scheduled to travel a distance outside city operations.[7]  Outbound freight is transported outside the city by "linehaul drivers" who return with more inbound

---

[4] Defendant's evidentiary submission, Exhibit A (Affidavit of Steve Blubaugh), ¶ 9.  At the summary judgment stage, the court must "recount the facts in the light most favorable to . . . the non-moving party."  *Wood v. Kesler*, 323 F.3d 872, 875 n.1 (11th Cir. 2003). "For that reason, what [is] set out in this opinion as 'the facts' for summary judgment purposes may not be the actual facts." *Id. See also, e.g.*, *Matthews v. Crosby*, 480 F.3d 1265, 1269 (11th Cir. 2007) (same).

[5] *See, e.g.,* Plaintiff's evidentiary submission, Exhibit 1 (First Deposition of Kevin Penn), at 96-97; plaintiff's evidentiary submission, Exhibit 8 (Affidavit of Kevin Penn), at Exhibit A.

[6] Blubaugh Affidavit, ¶ 2.

[7] Defendant's evidentiary submission, Exhibit F (Affidavit of Randy Stephenson), ¶¶ 2-3.

3

freight.[8]   Dock workers load the inbound freight onto trailers for city drivers to deliver locally.[9]   While out on delivery, city drivers use radios to keep the terminal informed of their status.[10]   Drivers are expected to punch in a Nextel radio at every pickup stop.[11]   This permits  supervisors to make decisions regarding what outbound freight a city driver should pick up on his or her way back from dropping off local inbound freight.[12]   The mangers who oversee these operations are called "inbound supervisors" and "outbound supervisors."

Tom Carl, a white male, became the overall manager at the Decatur Terminal shortly after Penn began work for Holland.[13]   The supervisors reporting to Carl were: Shane Luker, white male; Thomas Lightford, black male; Joey Norton, white male; and Ellen Conlin, white female.[14]   Randy Stephenson, white male, replaced Tom Carl as the manager at the Decatur Terminal in September of 2007.[15]   Stephen Blubaugh, a white male, is Holland's Vice President of Human Resources.[16]   Stacey

---

[8] *Id.*

[9] Stephenson Affidavit, at ¶ 3.

[10] Plaintiff's evidentiary submission, Exhibit 3 (Deposition of Thomas Carl), at 77-78; Stephenson Affidavit, ¶ 4.

[11] Penn Deposition I, at 107-08.

[12] Carl Deposition, at 77-78.

[13] *Id.* at 14.

[14] *Id.* at 17-18; plaintiff's evidentiary submission, Exhibit 6 (Deposition of Ellen Conlin), at 140-41.

[15] Stephenson Affidavit, ¶ 1.

[16] Blubaugh Affidavit, ¶ 1.

4

VandeVusse, a white female, also serves in Holland's human resources department.[17] Penn has voiced complaints to or about most of these individuals on numerous occasions.  As a bargaining unit employee, Penn is entitled to dispute management's employment-related actions by filing "grievances."[18]

Shortly after Tom Carl became manager of the Decatur Terminal, he noticed a company vehicle at a Verizon cell phone store.[19]  Carl determined that it was Penn's work vehicle.[20]  Carl went into the store, found Penn in line, and informed Penn that, according to the terminal, Penn was supposed to be "en route to a customer" at that time.[21]  Penn informed Carl that he was on his ten-minute break, and Penn believed that his radio reflected that fact.[22]  Penn was in the Verizon store for no more than ten minutes.[23]  Carl did not reprimand him, and there were no issues between Penn and the supervisors at the Decatur Terminal for the remainder of the year.[24]

In the Spring of 2007, however, Carl noticed Penn's work truck in a K-Mart

---

[17] *See, e.g.*, plaintiff's evidentiary submission, Exhibit 9 (Affidavit of Rebekah McKinney), Exhibit A, at Exhibit 10; Penn Deposition I, at 215.

[18] Blubaugh Affidavit, ¶¶ 7-8; Penn Deposition I, at 96-97; Penn Affidavit, Exhibit A.

[19] Carl Deposition, at 172-74; defendant's evidentiary submission, Exhibit B (Affidavit of Tom Carl), ¶¶ 4-5.

[20] Carl Deposition, at 172-74; Carl Affidavit, ¶¶ 4-5.

[21] Penn Affidavit, ¶ 6.

[22] *Id.*

[23] *Id.*

[24] Carl Deposition, at 173.

parking lot.[25]   After waiting for Penn to exit the store, Carl contacted Penn by radio and inquired as to his location.[26]   While still in the K-Mart parking lot, Penn responded that he was traveling on Interstate 65, en route to a customer's location.[27] Carl believed he needed two eyewitnesses before taking disciplinary action, so he "decided to cut Penn another break."[28]

On March 2, 2007, Ellen Conlin, the outbound supervisor at the time, noticed Penn talking on his cell phone while at work.[29]   Penn was on his ten-minute break.[30] When Conlin confronted Penn, he told her that "he was on the phone with his wife and that he would get off the phone when he was done."[31]   An argument ensued, which disrupted work operations.[32]   Conlin asked Penn to follow her to the mechanics' work bay to continue the conversation.[33]   She explained to Penn that he had to either get off of the telephone, or request permission from a supervisor to use

---

[25] Defendant's evidentiary submission, Exhibit B (Affidavit of Tom Carl), ¶ 6.

[26] *Id.*

[27] *Id.*

[28] *Id.* ¶ 7. While Penn "do[es] not recall an incident where Tom Carl saw [him] at K-Mart," he has produced no affirmative evidence to dispute the event.  *See* Penn Affidavit, ¶ 7.

[29] Plaintiff's evidentiary submission, Exhibit 6 (Deposition of Ellen Conlin), at 51.

[30] Penn Affidavit, ¶ 8.

[31] Conlin Deposition, at 51.

[32] *Id.*

[33] *Id.*

it.[34]

On March 9, 2007, Penn took a cell telephone call at work that related to the recent death of one of his relatives.[35]  The call happened to come while Penn was on his ten-minute break.[36]  When the Decatur Terminal Manager, Tom Carl, confronted Penn, he "shushed [Carl] away with his hand and continued to walk down the dock, still on the phone . . . ."[37]  Carl issued a written warning to Penn for using a cell telephone while on the dock, claiming it was a violation of company policy.[38]  While the parties dispute whether there was a cell telephone policy in place at the time, there is no dispute that, "from that point on . . . [Carl] put up the policy in which there was no cell phone uses [sic], including supervisors, for personal reasons."[39]

There were times when Penn, like other drivers, would take a "little longer on his lunch break."[40]  Thomas Lightford, an outbound supervisor, would generally give Penn and other drivers, some of whom were white, a verbal warning and "let it slide."[41]  That was not Carl's approach when Penn "went over [his] lunch period on

---

[34] *Id.* at 51-52.

[35] Penn Deposition I, at 167-70.

[36] *Id.* at 170.

[37] Carl Deposition, at 135.

[38] Penn Deposition I, at 173 & Exhibit 15.

[39] *Id.* at 170.

[40] Plaintiff's evidentiary submission, Exhibit 7 (Deposition of Thomas Lightford), at 32.

[41] Lightford Deposition, at 31-32.

March 9, 2007," however.[42]  Just before Penn took his lunch while on the road, a supervisor asked Penn to return to the terminal with freight.[43]  Penn dropped his trailer off at the terminal and then, according to Penn, "it took [him] ten minutes to get to where [he] needed to go to eat, and ten minutes to get back, and [he] went over [his] lunch."[44]  Carl claimed that Penn took a one and one half hour lunch, and that Penn attempted to justify this by claiming "his lunch that he took was only a half an hour . . . it took him a half an hour to get to where he was going to eat, half an hour to eat lunch[,] and half an hour to come back, and that he could get a statement from the waitress if [Carl] desired."[45] Although the parties disputed the severity of Penn's tardiness, Carl offered to Penn, and Penn accepted, a three-day suspension in lieu of termination for the late lunch.[46]  Carl waived the suspension, and Penn did not lose any work time or money.[47]  Charles Oden, a white male, was once fifteen minutes late from his lunch, and Carl reprimanded him with a warning letter.[48]

On March 12, 2007, Carl issued a written warning to Penn for failing to inform

---

[42] Penn Deposition I, at 158-59.

[43] *Id.* at 158.

[44] *Id.*

[45] Carl Deposition, at 109-11.

[46] McKinney Affidavit, Exhibit A, at Exhibit 4.

[47] Carl Deposition, at 109-11.

[48] Plaintiff's evidentiary submission, Exhibit 4 (Deposition of Joseph Norton), at 80-82.

the terminal of a delay that lasted longer than twenty minutes, something Penn was required to report pursuant to company policy.[49]  The terminal supervisors did not know, however, that Penn was unable to call in due to a lack of signal on his Nextel radio.[50]  Penn's unreported delay, which spanned two hours, also was due to the "awkward shape[]" of the freight, which required  Penn "to move freight around to get all the freight in."[51]

Carl began receiving complaints about Penn's work performance, including dissatisfaction regarding the amount of time Penn spent in performing his runs and picking up his loads, as well as a lack of communication from Penn.[52]  Carl asked the security personnel from Holland's parent company, YRC Security ("YRC"), to perform surveillance on Penn.[53]  On April 10 and 11, 2007, YRC placed a tracking device on Penn's truck in order to monitor his work activity.[54]  Based on the results, Carl "determined that [Penn] was untruthful on a few items that he listed, based on the time that the two people following him listed and the time that he listed, but that there wasn't a significant enough amount of time to go for a termination in [Penn's]

---

[49] Carl Deposition, at 127; McKinney Affidavit, Exhibit A, at Exhibit 5.

[50] Penn Deposition I, at 162-63.

[51] *Id.* at 163.

[52] Carl Deposition, at 139-40.

[53] *Id.* at 139-40.

[54] *Id.* at 140-41; McKinney Affidavit, Exhibit A, at Exhibits 7, 8.

case."[55]   Therefore, no action was taken, and Carl did not inform Penn of the surveillance.[56]  Holland employee George Lane, a white male, was also placed under surveillance due to suspicions that he was stealing time.[57]

Under the union contract, bargaining unit employees are guaranteed eight hours of pay per work day.[58]  On the evening of June 7, 2007, Penn had worked his eight hours and was on overtime while George Dixon, a white male, had been on the clock for only seven hours and fifteen minutes.[59]  Joey Norton, an outbound supervisor, directed Penn and Dixon to change placards on the trailers while Norton closed the terminal for the evening.[60]  Norton then signed them both off of the clock manually, a clear violation of the union contract, which required that employees were to sign themselves out by punching a time clock.[61]  Penn, who already was on overtime, was given only fifteen minutes of additional overtime to change the placards, while Dixon received forty-five minutes, which closed out his guaranteed eight hours.[62]  Penn filed a grievance through the union, claiming that "Joey Norton was stealing time away

---

[55] Carl Deposition, at 141.

[56] *Id.*; Penn Affidavit, ¶ 10.

[57] Carl Deposition, at 113-15, 124, 183; Carl Affidavit, ¶ 22; Conlin Deposition, at 69.

[58] Carl Affidavit, ¶¶ 14-15; Penn Deposition I, at 140-42.

[59] Carl Affidavit, ¶¶ 14-15.

[60] *Id.*

[61] *Id.* ¶ 13; Penn Affidavit, ¶ 16.

[62] Penn Deposition I, at 140-41.

from [him]."[63]  Holland fully compensated Penn for the extra thirty minutes that he worked that night.[64]

On another occasion, Penn noticed that Norton allowed other drivers, at least two of whom were white, to leave an hour before they completed a full day's work.[65] Penn confronted Norton and stated:  "Hey, they are leaving before their eight hours."[66]  Norton responded:  "Well, you stay to get your eight hours."[67]  Penn then waited in the driver's lounge "for [his] eight hours to come up."[68]  "Right then, [Penn] just decided to follow due process and file a grievance on it."[69]  Carl learned of this problem and made it a policy that, "in order for [employees] to get paid for eight hours, they [had] to stay for eight hours."[70]

On June 12, 2007, Outbound Supervisor Joey Norton observed Penn, again, using his cell telephone while at work.[71]  Penn's phone was in use for a total of

---

[63] *Id.* at 141.

[64] *Id.* at 144, 151, 156-57; Carl Affidavit, ¶ 16.

[65] Penn Deposition I, at 142-43.

[66] *Id.* at 143.

[67] *Id.*

[68] *Id.* at 148.

[69] *Id.* at 143.

[70] Penn Deposition I, at 143.

[71] Norton Deposition, at 87-93.

ninety-five minutes that work night.[72]  Norton observed Penn "[o]n the yard propped up against the fence," at which point Norton time stamped a piece of paper in order to make a record.[73]  Thirty minutes later, Norton returned and saw Penn on the phone and "still in the same position."[74]  Norton returned to work and, roughly fifteen or twenty minutes later, Norton observed Penn in his personal vehicle.[75]  Penn, when he was on his ten-minute break, "went to [his] car to put [his] phone up and charge the phone in [his] car."[76]  Norton confronted Penn, and told him "he needed to get off the cellphone and get back to work."[77]   A "discussion" ensued, about which Penn testified as follows:

> Q.    Do you recall trying to bump, physically bump Mr. Norton?
>
> A.    No, Sir.
>
> Q.    Do you recall going into the office where Ellen Conlin told you to take a ten-minute cooling period[, as required by the union contract]?
>
> A.    Upon entering the office, Joey Norton told me to come to the office, so I was walking to the office.  Upon coming in the office, he said, "are you leaning against me to bump me?"  I said no.  I

---

[72] Blubaugh Affidavit, ¶ 19, Exhibit 2; defendant's evidentiary submission, Exhibit M, (Second Deposition of Kevin Penn), at 9.

[73] Norton Deposition, at 89.

[74] *Id.*

[75] *Id.* at 92-93.

[76] Penn Deposition I, at 176.

[77] Norton Deposition, at 94.

said, "I'm telling you[,] you were retaliating on me because I wrote a grievance on you."

Q.     Mr. Penn, isn't it true when Ms. Conlin told you to take ten minutes, you told her to shut up?

A.     Not that I'm aware of sir.  I told her I was talking to [Norton]. [He] told me to come in his office. And she said – she was making a statement about something, I can't recall.  I was like, "I'm talking to [Norton], I'm not talking to you."  Because he was asking me a question and we was [sic] having a discussion then.[78]

Penn left the office, and, in the meantime, Norton and Conlin discussed the situation with Carl.[79]  Carl instructed them to relieve Penn of duty, at which point Conlin gave Penn five minutes to leave the property.[80]

At least five other employees, some white and others black, were disciplined, but to a lesser extent, for cell telephone use.[81]  Penn once heard Outbound Supervisor Joey Norton on the telephone discussing horses, indicating the call was not work-related, but Decatur Terminal Manager Tom Carl generally permitted supervisors like Norton to use their cell telephones at work, "because [Carl] had their cellphone numbers."[82]  The only detailed instance recalled by anyone involved an African-American employee who asked permission from his supervisor to take a ten or eleven

---

[78] Penn Deposition I, at 181-82.

[79] Norton Deposition, at  96-97.

[80] Carl Deposition, at 152-54; McKinney Affidavit, Exhibit A, at Exhibits 11, 74.

[81] Carl Deposition, at 68-71; Norton Deposition, at 86.

[82] Penn Deposition I, at 188; Carl Deposition, at 68.

minute telephone call regarding a family issue.[83]

Penn filed a grievance over the termination with the union, and the relevant parties agreed that Penn would be reinstated with only an unpaid, six-day suspension as discipline.[84] As a condition of reinstatement, Penn signed a document agreeing to "apologize to Ellen Conlin for the disrespect [he] showed that in part lead to [his] suspension."[85] Penn could not recall apologizing to Conlin, but he was, nevertheless, reinstated on June 26, 2007.[86] The following day, Penn called Stacey VandeVusse in Holland's Human Resources office, to report the incident in which Norton manually clocked him out thirty minutes early, and told her that he felt "he [was] being treated differently" by Norton, and that Norton "treat[ed] people differently by who he like[d]."[87]

Penn also reported to Ms. VandeVusse that, on an unspecified date, he observed racial graffiti on the wall of one of Holland's trailers.[88] The graffiti included the phrases "nappy headed ho" and something to the effect of "Americans

---

[83] Lightford Deposition, at 24-25, 54-55, 65.

[84] Penn Deposition I, at 185 & Exhibit 17.

[85] *Id.*

[86] Penn Deposition I, at 186.

[87] McKinney Affidavit, Exhibit A, at Exhibit 10.

[88] Penn Deposition I, at 200-201; McKinney Affidavit, Exhibit A, at Exhibit 10.

for Republicans, niggers for Democrats."[89]   When Penn reported the graffiti,
Outbound Supervisor Joey Norton instructed him to "[h]ave tough skin."[90]   Norton
denied that Penn raised any graffiti issue with him.[91]   The trailer was not immediately
cleaned, and it "left that terminal the way it was on there."[92]   When Terminal Manager
Tom Carl learned of the graffiti, he interviewed Joey Norton, Ellen Conlin, and
Holland's account executive Barry Moore.[93]   Carl called a meeting with Penn, his
union representative, and Shane Luker, one of the terminal supervisors, to discuss the
matter.[94]   Carl suggested that Penn and Norton resolve their problems, shake hands,
and move forward amicably.[95]

A few days later, on July 30, 2007, while Penn was at a customer's place of
business, he was having trouble locating freight that he was to pick up.[96]   The
customer was pressuring Penn to hurry, because other trucking companies were

---

[89] Penn Deposition I, at 199-204.  This court "do[es] not explicate this vulgar language
lightly, but only because its full consideration is essential to measure whether these words and this
conduct could be read as having created 'an environment that a reasonable person would find hostile
or abusive.'" *Reeves v. C.H. Robinson, Inc.*, 594 F.3d 798, 803 (11th Cir. 2010) (*en banc*) (quoting
*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).

[90] *Id.* at 201.

[91] Norton Deposition I, at 116.

[92] Penn Deposition I, at 201.

[93] Carl Affidavit, ¶¶ 17-18.

[94] Defendant's evidentiary submission, Exhibit 10; Penn Deposition I, at 215-17.

[95] *Id.*

[96] Penn Deposition I, at 219.

15

waiting.[97]  Penn was unable to reach anyone on his Nextel radio.[98]  Penn then "alerted the radio" to make it sound continuously.[99]  Penn was "trying to alert [the terminal] . . . because  the customer was getting short with [him] because [he was] holding up the other customers because nobody was answering that Nextel."[100]  Norton then answered the Nextel and yelled at Penn, stating:  "I'm on the phone . . . . Do not continue to call me when I haven't answered.  I will get to you when I can get to you."[101]  Norton's statement "embarrassed" Penn, which prompted Penn to take a witness with him to discuss it with Norton upon arriving back at the terminal.[102]

The following day on July 31, 2007, Penn complained directly to Stephen Blubaugh, Holland's Vice President of Human Resources, about Norton yelling at him over the radio.[103]   On August 3, 2007, Penn complained multiple times to Blubaugh and Stacey VandeVusse, reporting that Norton gave overtime work to a less senior employee.[104]  Specifically, Penn stated: "Supervisor did not offer work to me before a casual.  Sent a casual into overtime and sent me home on my 8.  Not

---

[97] *Id.*

[98] *Id.*

[99] *Id.*

[100] *Id.*

[101] Penn Deposition I, at 220, 225.

[102] *Id.* at 225-27.

[103] Blubaugh Deposition, at 97-98; McKinney Affidavit, Exhibit A, at Exhibit 21.

[104] Blubaugh Deposition, at 103; Penn Deposition I, at 228-29.

happening to any other employee. *He is discriminating against me.*"[105]  Additionally,

Penn reported that Norton manually signed him out before he was done working.[106]

Penn, again, called back regarding the same issues on August 7, 2007.[107]

Blubaugh instructed Tom Carl to look into Penn's claim that he was passed

over for overtime work in violation of the union contract.[108]  Sometime prior to

Penn's second termination on August 8, 2007, Carl spoke with Joey Norton, who

claimed that "he did not realize that Penn was on the dock when he assigned the work

to the less senior driver."[109]  Ellen Conlin supported Norton's claim that passing Penn

over was an "honest mistake."[110]  Nevertheless, Holland paid Penn for the work

performed by the less senior driver.[111]

When Tom Carl was the terminal manager, he maintained a policy that drivers

were not allowed to enter the terminal office.[112]  That policy was changed after Carl

left the position in July 2007,[113] though the change was in practice only; it was

---

[105] Blubaugh Deposition, at 103-06; McKinney Affidavit, Exhibit A, at Exhibit 23 (emphasis supplied).

[106] Blubaugh Deposition, at 101-106; McKinney Affidavit, Exhibit A, at Exhibit 23.

[107] McKinney Affidavit, Exhibit A, at Exhibit 23.

[108] Blubaugh Affidavit, ¶ 14.

[109] McKinney Affidavit, Exhibit A, at Exhibit 36.

[110] *Id.*

[111] Carl Affidavit, ¶ 21.

[112] Penn Deposition I, at 230.

[113] Carl Affidavit, ¶ 1.

communicated to Holland's personnel, but not in the proper manner according to the union contract.[114]  Two weeks after the change, on August 8, 2007, Penn was on the dock pulling freight when Ellen Conlin approached him to inquire about what he was doing.[115]  Penn answered Conlin, but he soon after noticed Conlin looking at him.[116] Penn felt "something wasn't right" and, consequently, made himself "more aware."[117] Joey Norton later told Penn that Conlin wanted to see him in the terminal office.[118] Penn knew that Carl's policy of no drivers in the office had not been properly "disbanded," but he believed, nevertheless, that "[i]f you want a witness, you can go in the office."[119]  Penn requested to bring a witness with him, which provoked Conlin's repeated screams for Penn to come into the office.[120] Penn testified:  "Prior to that day, I had filed complaints of discrimination, retaliation, and harassment.  I also had a grievance filed that also wasn't resolved."[121]  Though there were potential witnesses present, including Penn's co-worker Byron McKelvey, Penn left the area to find a witness.[122]  Penn has provided no explanation for leaving the area to find a

---

[114] Penn Deposition I, at 229-30; Conlin Affidavit, ¶¶ 2-3; Conlin Deposition, at 92-93.

[115] Penn Affidavit, Exhibit A.

[116] *Id.*

[117] *Id.*

[118] *Id.*

[119] Penn Deposition I, at 231.

[120] Penn Affidavit, Exhibit A.

[121] *Id.*

[122] *Id.*

witness when witnesses were already present.[123]   In the meantime, Conlin consulted with Norton and the union representative.[124]   McKelvey found Penn, reminded him that Conlin wanted him in the office, and volunteered to serve as Penn's witness.[125] Penn entered the office where he was terminated, allegedly for failure to follow a reasonable work request.[126]   Penn filed a grievance against Conlin and the termination, and the conclusion was that Ellen Conlin failed to provide Penn with a ten-minute cooling off period, as required by the union contract, before terminating his employment.[127]   The parties agreed to settle the matter by reducing Penn's discipline from a termination to an unpaid suspension.[128]

Prior to Penn's termination, but on the same day, Penn filed a complaint with Holland's Human Resources department, alleging that Joey Norton had altered his time card three times, that Norton had "retaliated against him" by accusing Penn of stealing time during the June 12, 2007 cell telephone termination-suspension, and that Norton refused to clean up the trailer with racial graffiti and, instead, directed Penn to "have some tough skin."[129]   No one at the Decatur Terminal had knowledge of

---

[123] *See id.*

[124] Conlin Deposition, at 97.

[125] Penn Affidavit, Exhibit A.

[126] Conlin Affidavit, ¶ 4.

[127] Penn Deposition I, at 234 & Exhibit 18.

[128] *Id.*

[129] McKinney Affidavit, Exhibit A, at Exhibit 24; Blubaugh Affidavit, ¶ 15.

these particular complaints at the time of Penn's termination, although at least some of the supervisors were aware of Penn's previous complaints.[130]

On August 9, 2007, Penn supplemented his complaint, alleging that he was terminated on August 8, 2007 in retaliation for his previous complaints.[131]   The following day, August 10, 2007, Penn filed a charge of discrimination with the Equal Employment Opportunity Commission, in which he complained of race discrimination and retaliation.[132]   In the charge, Penn reported the following:  Joey Norton altered his time card; Norton's comment about having tough skin in response to the racial graffiti; and the June 12, 2007 termination-suspension for "stealing time" when he was on a break in his car charging his cell telephone.[133]   Stephen Blubaugh traveled to Decatur from Michigan, investigated Penn's charges, and  "concluded in [his] business judgment that terminal management had legitimate, non-discriminatory reasons for taking the challenged actions with respect to Penn."[134]   On March 19, 2008, the EEOC issued a dismissal and notice of Penn's right to sue, but Penn did not file a suit within ninety days.[135]

---

[130] McKinney Affidavit, Exhibit A, at Exhibit 24; Blubaugh Affidavit, ¶¶ 15-16; Conlin Deposition, at 113-14.

[131] McKinney Affidavit, Exhibit A, at Exhibit 24.

[132] *Id.* at Exhibit 26.

[133] *Id.*

[134] Blubaugh Affidavit, ¶¶ 20-24.

[135] McKinney Affidavit, Exhibit A, at Exhibit 46.

Penn was reinstated on August 14, 2007.[136]   The following month, Randy Stephenson filled the vacant position left by Tom Carl as manager of the Decatur terminal.  In September 2007, Stephenson filled the vacant position left by Carl as terminal manager.[137]   Shortly thereafter, on September 24, 2007, Penn became involved in a dispute with Ronnie Artis, a white co-worker.[138]  Penn became angry when Artis damaged freight, and the two began to yell at each other.[139]  Artis said to Penn, "Shut the fuck up, black motherfucker!"[140]  Penn responded and "poked Ronnie on the end of the nose."[141]   Upon investigating the incident, Holland terminated Artis's employment, and Penn received a warning letter "for participating in and/or instigating a verbal confrontation with a fellow worker that culminated in [Penn] touching the other employee."[142]

On November 7, 2007, Ellen Conlin was unable to contact Penn for a period of more than two hours after repeatedly trying to raise him on the Nextel radio.[143] Penn was driving one of his longest routes, along which there were many areas of

---

[136] McKinney Affidavit, Exhibit A, at Exhibit 30; Penn Deposition I, at 234-35 & Exhibit 18.

[137] Stephenson Affidavit, ¶ 1.

[138] Penn Deposition I, at 238-40; Norton Deposition, at 139-40.

[139] *Id.*

[140] Penn Deposition I, at 240, 242.

[141] McKinney Affidavit, Exhibit A, at Exhibit 33.

[142] Stephenson Affidavit, ¶ 13; McKinney Affidavit, Exhibit A, at Exhibit 34.

[143] Conlin Deposition, at 105 & Exhibit 7.

poor radio reception.[144]   Conlin called the contact number on the wall listed on the driver's sheet for Penn.[145]   Conlin testified that she intended to call Penn's cell telephone, but she actually called his home and spoke with Penn's wife.[146]   Conlin also sent an email to Terminal Manager Randy Stephenson, to inform him that she was unable to contact Penn.[147]   In that email, she stated:  "I will ask [Penn] what was the issue when he gets in but it is more of a worry some [sic] situation if he is okay or not now.  I will let you know what he says."[148]   Outbound Supervisor Joey Norton apparently was copied on the email, because he responded by claiming that he had received word from a Holland employee that "[Penn] was setting [sic] on the side of the road with flashers on . . . where the [T]aco [B]ell is."[149]   The following day, Stephenson forwarded these emails to several individuals, including Blubaugh and YRC Security, noting that he "had reasons to suspect that [Penn] was stealing company time."[150]   Stephenson stated, in pertinent part:

> I have yet to factually prove the past rumors that a couple time [sic] a week [Penn] stops off at a gym and spends time there before bringing his load in.

---

[144] Penn Deposition I, at 244.

[145] Conlin Deposition, at 117-21.

[146] Id.

[147] Blubaugh Deposition,  at 158; McKinney Affidavit, Exhibit A, at Exhibit 36.

[148] Id.

[149] Id.

[150] Id.

Last night [Norton] received a telephone tip from an individual refusing to identify himself, except to say he works for USF Holland. I drove to where the tip reported our unit to be parked and was not able to locate the unit. Later I was informed that [Penn] had arrived at the terminal. [Norton] is the supervisor [Penn] named in his EEOC complaint.

On a regular basis we have problems with this employee and his reporting of breaks [sic] on his [radio] unit.  There has been two times in the past 6 weeks where we can not get thru to his unit and he claims it is not working.

After [Penn's] arrival, we have tested his unit and it will not receive the base call.  However doing it in reverse calling base from his handheld seems to unfreeze the unit to receive calls.

Additionally this employee has on more than two occasions, not showed himself returning from lunch in his handheld.

I do not know if this employee has filed a lawsuit trying to secure money due to his EEOC complaint.

[address of Penn's alleged gym]

I will keep an eye on this [gym] location now that I have this info.

Just wanted to inquire if we wanted to setup the facts better before disciplinary action.[151]

When Penn learned of Ellen Conlin's telephone call to his home, he "wasn't

pleased," because it "cause[d] strife in [his] household" due to his wife's suspicions

---

[151] *Id.*

about his truthfulness when conveying his work schedule.[152]  Penn lost service on his radio during the long trip, which is why Conlin could not raise him on the radio, but Penn did not use his cell telephone to keep the terminal informed of his status.[153] Penn reported Ellen Conlin's call to Joey Norton, and Norton contacted Penn's wife and explained Conlin's mistake.[154]  Penn also met with Randy Stephenson and the union representative and advised that he would "bring charges of harassment" against Ellen Conlin if she called his home again.[155]  Stephenson investigated the incident and determined that "Conlin had used the phone number that appeared on a driver call-in form that was originally populated [sic] by the drivers themselves.  The numbers on the form were purported to be the drivers' cell phone numbers."[156]  Penn also left a telephone voicemail message with Stephen Blubaugh, reporting Conlin's call to his home.[157]  Blubaugh emailed Stephenson, attaching the transcribed voicemail message and asking Stephenson about his response.[158]   In his email, Blubaugh stated, "I returned Mr. Penn's call and listened to his soliloquy."[159]

---

[152] Penn Deposition I, at. 245-47.

[153] *Id*. at 244-45, 250.

[154] *Id.* at 247, 249; Norton Deposition, at 141.

[155] Stephenson Affidavit, ¶ 15.

[156] *Id*. ¶ 16.

[157] Blubaugh Deposition, at 157; McKinney Affidavit, Exhibit A, at Exhibit 35.

[158] Blubaugh Deposition, at 158; McKinney Affidavit, Exhibit A, at Exhibit 36.

[159] *Id.*

Norton passed Penn over for extra work again on November 27, 2007, which prompted a complaint from Penn to Stephenson.[160]

In January of 2008, Terminal Manager Randy Stephenson filled out a form requesting further surveillance of Penn by YRC Security personnel.[161]  Under the heading "Briefly describe the nature of the surveillance requested," Stephenson wrote:

> Already have satellite tracking of driver's cell phone.  Driver has history of turning phone off to prevent tracking.  Driver has hostile attitude about being questioned about his activities.  Driver has argued with supervisors regarding their questions.  Driver has in the past filed an EEOC complaint claiming discrimination.  Driver constantly is late arriving [at] terminal causing service failure on [outbound operations].  Driver has in the past taken a 10 minute break, claims 10 minutes work, takes 30 minute lunch break/claims 10 minutes work.  And then takes another 10 min break.  Previous manager suspected driver of stealing time and working out at a Decatur athletic club while on duty, however he had no evidence.  I did confirm that he hold [sic] membership at a local athletic club.[162]

When YRC agreed only to send a tracking device at a later date, Stephenson notified Holland leadership on January 15, 2008 that he intended to conduct the surveillance himself.[163]  Stephenson had a tracking device installed on Penn's work vehicle.[164]

---

[160] *Id.*

[161] McKinney Affidavit, Exhibit A, at Exhibit 37.

[162] *Id.*

[163] *Id.*; Blubaugh Deposition, at 173.

[164] Norton Deposition, at 149.

"The tracking device remained on [Penn's] tractor for one day, at which time it was removed and transported for use at another facility.  The device did not provide adequate information to support or refute Holland's suspicions that Penn was stealing time, and Penn was not disciplined."[165]  Only one other Holland employee has been subject to surveillance due to suspicions of stealing time.[166]  That employee was a white male named George Lane, and he was terminated.[167]

On January 25, 2008, Penn spent seventy-four minutes driving to Guntersville, Alabama, but one-hundred-thirty-nine minutes on the return trip to Decatur without calling to report a delay.[168]  Shane Luker issued Penn a written warning for abuse of company time, which stated:   "You did not call in any delays.  You have been instructed to call in any delays of twenty minutes or more."[169]  Although Holland did maintain a policy that required drivers to call in delays of twenty minutes or more, that policy did not specifically address the circumstances in which drivers were trapped in slow moving traffic.[170]  Penn's delay was due to slow moving traffic and,

---

[165] Stephenson Affidavit, ¶ 18.

[166] Carl Deposition, at 113-15, 124, 183-84; Carl Affidavit, ¶ 22; Conlin Deposition, at 69; Lightford Deposition, at 29-30; Penn Deposition I,  at 346.

[167] *Id.*

[168] Plaintiff's evidentiary submission, Exhibit 5 (Deposition of Shane Luker), at 65-67; McKinney Affidavit, Exhibit A, at Exhibit 38.

[169] McKinney Affidavit, Exhibit A, at Exhibit 38.

[170] Norton Deposition, at 99; Carl Deposition, at 65-66.

therefore, he did not violate the company's policy in failing to report his status.[171]  He

filed a grievance challenging Luker's warning letter in which he stated:

> Shane Luker never even consider [sic] driving condition that I couldn't control.  When driver's [sic] are on 565 interstate heading to Decatur from Huntsville on 6 lanes[,] what would take 30 min will take an hour and drivers don't call in a 20 min delay and they are stopped. I wasn't delayed 20 min. stopped.  Traffic was steady moving at 10 to 15 mph.  By this explanation I was never delayed 20 minutes stopped. I have just earned my 2 year safe driver badge for driving a rig, not sitting behind a computer assuming driving conditions are perfect.  Mr. Luker needs to ride with drivers and understand traffic is different at certain times and places.  I will not drive reckless and endangering [sic] my life or other drivers [sic] lives to tailgate or push traffic to go faster. A dispatcher that pressure [sic] drivers to speed will get some people killed.[172]

On February 8, 2008, Penn contacted the terminal and said he had not taken his

lunch.[173]  When Shane Luker asked whether Penn would be eating in Huntsville or

Decatur, Penn responded that "it wasn't none of [his] business."[174] Penn's radio then

malfunctioned — he did not turn it off —  and Penn went to eat lunch.[175]  Penn saw

Luker watching him from "behind a building" while he was eating his lunch.[176]  Luker

claimed that he stopped at the gas station across the street from where Penn was

---

[171] Penn Deposition I, at 252-56; *see also* McKinney Affidavit, Exhibit A, at Exhibit 39.

[172] McKinney Affidavit, Exhibit A, at Exhibit 39.

[173] Luker Deposition, at 69-70; Penn Deposition I, at 270-72.

[174] Penn Deposition I, at 277-78.

[175] *Id.*

[176] *Id*. at 257-60 & Exhibit 21.

dining, but that he was not following Penn.[177]  Penn received a warning for his alleged

failure to comply with a reasonable work request, *i.e.*, not providing his lunch plans

when asked and also for allegedly refusing to explain why he had turned his radio

off.[178]  Penn filed yet another grievance, alleging harassment and retaliation, and

challenging the warnings and Luker's surveillance of him, but the union declined to

pursue the challenge.[179]  Penn then filed a complaint with Holland's Human

Resources department on February 14, 2008, alleging that Stephenson was retaliating

against him for his prior complaints, and that the company improperly had him under

electronic surveillance.[180]  Stephen Blubaugh conducted a cursory investigation, and

he "found no evidence of discrimination and thus took no action."[181]

A few days later, on February 18, 2008, Penn felt that the particular tractor

assigned to him was unsafe.[182]  Shane Luker then assigned Penn a different tractor,

which had an oil leak.[183]  Penn contacted Stephen Blubaugh and reported that he was

assigned a dangerous tractor.[184]   Other than requesting a report from Terminal

---

[177] Luker Deposition, at 70-72.

[178] McKinney Affidavit, Exhibit A, at Exhibits 42, 43.

[179] Penn Deposition I, 266-67, 274-78; Stephenson Affidavit, ¶ 21.

[180] Blubaugh Deposition, at 179; McKinney Affidavit, Exhibit A, at Exhibit 44.

[181] Blubaugh Affidavit, ¶ 24.

[182] Luker Deposition, at 72-76; Penn Deposition I, at 282-86; McKinney Affidavit, Exhibit A, at Exhibit 45.

[183] Luker Deposition, at 72-76; McKinney Affidavit, Exhibit A, at Exhibit 45.

[184] Luker Deposition, at 181-82; McKinney Affidavit, Exhibit A, at Exhibit 45.

Manager Randy Stephenson, no action was taken by Blubaugh.[185]

On August 8 and 14, 2008, Penn received two more warning letters from Terminal Manager Randy Stephenson for returning to work without making an important delivery when Penn became ill.[186]  The only other driver who received a warning letter for failing to make a similarly important delivery when illness struck was Doyle Lane, a white Holland employee, and Penn received his warning well before Lane.[187]  Other employees, some white and some black, who became ill while working and, consequently, returned to the terminal did not receive formal warnings.[188]

Randy Stephenson issued another warning letter to Penn for alleged abuse of company time on August 12, 2008, citing a discrepancy between the delivery and pick-up times entered on Penn's radio and the notations on Penn's trip manifest.[189]

On the same day, Penn spent two hours at a customer's location, even though it only had taken Penn fifteen minutes to load the customer's freight onto his trailer.[190] Penn had been encouraged, as part of a competition, to make it a practice of

---

[185] Blubaugh Deposition, at 181-82.

[186] *Id*. at 186; McKinney Affidavit, Exhibit A, at Exhibit 48.

[187] Stephenson Affidavit, ¶ 32, Exhibit 6.

[188] Penn Deposition I, at 304-05; Lightford Deposition, at 67.

[189] Stephenson Affidavit, ¶ 23; McKinney Affidavit, Exhibit A, at Exhibit 49.

[190] Stephenson Affidavit, ¶ 24; Norton Deposition, at 155-56.

attempting to secure extra freight from customers.[191]  At that time, Penn was "one of the leaders on that [competition] board," and he "felt [that] through talking to management and getting to know management that [he] could get leads . . . ."[192]  Penn spent the extra time with the customer because, "[i]n order to go after that freight, you have to get to know the people."[193]  Penn was on his last stop that day, and he did secure more freight during the extra one hour and forty-five minutes.[194]   Holland supervisors "congratulated him [for] this."[195]  Unconvinced by Penn's story, however, Randy Stephenson contacted Holland's Labor Union Department to determine whether his receipt of information from a customer that Penn actually spent the entire time talking to a security guard would justify changing Penn's warning letter to a termination.[196]

A few days later, on August 14, 2008, Penn went to his regularly assigned vehicle and discovered that a noose had been placed in his cab, and his gloves and seat had been covered in grease.[197]  When asked, Stephen Blubaugh conceded that

---

[191] Penn Deposition I, at 298-99.

[192] *Id.* at 299.

[193] *Id.* at 300.

[194] *Id.* at 301.

[195] *Id.*

[196] Blubaugh Deposition, at 198; McKinney Affidavit, Exhibit A, at Exhibit 55.

[197] Penn Deposition I, at 308-10; Stephenson Affidavit, ¶ 34; Norton Deposition, at 152-53.

nooses "are an ugly symbol, particularly to an African-American."[198]   Holland photographed the tractor, removed the noose, and took the vehicle out of service until the grease could be cleaned and the seat replaced.[199]   Holland also had YRC Security personnel and the local police department look into the matter, but neither investigation resulted in any suspects.[200]   Blubaugh, again, visited the Decatur terminal where he conducted training sessions and reviewed Holland's harassment policies.[201]   Holland also installed security cameras at the terminal.[202]

On August 26, 2008, Penn made another complaint to human resources, alleging that Stephenson's August 12 and 13, 2008 warning letters were retaliatory, and he also reported the noose and grease incident.[203]   No further action was taken by Holland.[204]

Stephenson issued another warning letter when Penn lost his radio on September 18, 2008.[205]   Penn filed a second charge with the EEOC on September 20,

---

[198] Blubaugh Deposition, at 193.

[199] Stephenson Affidavit, ¶ 35; Penn Deposition I, at 309-16, 327-38, Exhibit 24.

[200] Blubaugh Deposition, at 196-97, 202, 211; Penn Deposition I, at 318-19; Stephenson Affidavit, ¶ 35; McKinney Affidavit, Exhibit A, at Exhibits 52, 56, 64.

[201] Blubaugh Deposition, at 193-96; Penn Deposition I, at 93-94; McKinney Affidavit, Exhibit A, at Exhibits 53, 54.

[202] Blubaugh Deposition, at 192; Penn Deposition I, at 318-19.

[203] Blubaugh Deposition, at 204-05; McKinney Affidavit, Exhibit A, at Exhibit 59.

[204] *Id.*

[205] Blubaugh Deposition, at 213; McKinney Affidavit, Exhibit A, at Exhibit 67.

2008, and a dismissal and Notice of Rights letter was mailed to him on September 22, 2009.[206]  Penn filed his first complaint with this court on February 2, 2009,[207] and then amended that complaint to include his Title VII claims on November 6, 2009.[208]

## III.  DISCUSSION

### A.  Penn's Racially Hostile Work Environment Claims Under 42 U.S.C. § 1981 and Title VII

Penn alleges that he has been subjected to a racially hostile work environment under Title VII and 42 U.S.C. § 1981.[209]  The elements of a racially hostile work environment claim are the same, regardless of whether the claim is viewed through the lens of Title VII or § 1981.  *See Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009) ("We pause to note that discrimination claims, including hostile work environment claims, brought under the Equal Protection Clause, 42 U.S.C. § 1981, or Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, are subject to the same standards of proof and employ the same analytical framework."); *see also*, *e.g.*, *Brown v. Progress Energy*, 364 Fed. Appx. 556, 557 n.1 (11th Cir. 2010) ("We analyze employment discrimination cases brought pursuant to § 1981 using the same substantive analysis as those brought pursuant to Title VII of the Civil Rights Act of

---

[206] *See* doc. no. 20 (plaintiff's first amended complaint), Exhibits A, B.

[207] Doc. no. 1.

[208] Doc. no. 20.

[209] *See id.*

1964.").

In order to prove a claim for a racially hostile work environment, a plaintiff must demonstrate that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002). To meet this burden, a plaintiff must show: (1) he belongs to a protected group; (2) he has been subject to unwelcome harassment; (3) the harassment was based on a protected characteristic, such as the plaintiff's race; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatory abusive working environment; and (5) the employer is responsible for such environment under a theory of either vicarious or direct liability. *Id.*; *see also*, *e.g.*, *Freeman v. City of Riverdale*, 330 Fed. Appx. 863, 864 (11th Cir. 2009).

## 1.    Harassment based on a race

Holland challenges only plaintiff's proof on the third and fourth elements. Holland first argues that Penn has failed to show that any of the conduct complained of constituted harassment based on a protected characteristic: in other words, even if Penn were harassed, such harassment was not based upon his race.[210] "Title VII

---

[210] Doc. no. 39, at 36-37.

was never intended to protect employees from all unpleasant and rude conduct in the workplace." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1253 (11th Cir. 1999). Instead, "[i]t is an *anti-discrimination* statute." *Id.* at 1253-54 (emphasis supplied). As such, the harassment must be based on a protected characteristic, such as race. *See*, *e.g.*, *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002); *see also Enwonwu v. The Fulton-Dekalb Hospital Authority*, 286 Fed. Appx. 586, 602 (11th Cir. 2008) (holding that the plaintiff had failed to establish that "the alleged harassment . . . was based on a protected characteristic," when the alleged harasser "did not make any comments about her race or national origin"); *Howard v. United Pruitt Corp.*, 196 Fed. Appx. 780, 781 (11th Cir. 2006) (finding plaintiff's hostile work environment claim inadequate when plaintiff "failed to offer any evidence that any of the[] incidents were related to her race"); *Austin v. City of Montgomery*, 196 Fed. Appx. 747, 751-752 (11th Cir. 2006) (holding that defendant was entitled to summary judgment on plaintiff's racially hostile work environment claim when plaintiff failed to present evidence that any unwelcome harassment was based upon race).

The overwhelming majority of harassment complained of by Penn is unsupported by evidence linking that conduct to his race.[211] There is, however, ample

---

[211] Penn contends that all of the following constitutes an unlawful, racially hostile work environment:

evidence in the record indicating that any harassment Penn may have suffered was due to a perception that he was less than a stellar employee.[212]  Nevertheless, upon consideration of the entire record, the court cannot say that *none* of the alleged harassment for which Penn has presented evidence can be considered race-based.  In June 2007, Penn found racist graffiti in a trailer and reported it to Norton.[213]  In response, Norton allegedly told Penn to "have tough skin."[214]  In September 2007, a co-worker told Penn to "shut the fuck up, black motherfucker."[215]  Almost a year later, on August 14, 2008, Penn found grease on his truck seat and a noose in the tractor.[216]  These incidents constitute harassment based upon Penn's race and, therefore, satisfy the third element of a hostile work environment claim.

------

> [T]he March, 2007, warnings, the April 10-11, 2007 surveillance, the June 12, 2007, termination, the violation of [Penn's] seniority, the alteration of his time card, the July, 2007, incident with the Nextel radio where Norton yelled at [Penn] in front of a customer, the August, 2007, termination, all the subsequent warnings [Penn] received, the additional surveillance both when being followed by Norton and when Stephenson requested surveillance from YRC, the assignment of Penn to an unsafe vehicle, the noose incident and the graffiti on the trailer which was not addressed or removed.

Doc. no. 47, at 39 (citations omitted).

[212] *See, e.g.*, McKinney Affidavit, Exhibit A, at Exhibit 27 (email from Carl to VandeVusse on June 27, 2007) ("Mr. Penn has a major chip on his shoulder for Joey Norton because he was fired by him . . . . Mr Penn is in my opinion a very dramatic liar . . . . He is a terrible worker and is offended by anyone that tells him to get to work.").

[213] Penn Deposition I, at 199-204.

[214] *Id*. at 201.

[215] *Id.* at 240, 42.

[216] *Id.* at 308-10.

## 2.    Sufficiently severe or pervasive to alter the terms and conditions of plaintiff's employment

The court's analysis, however, does not end with the third element.  The fourth element of a *prima facie* hostile work environment claim — *i.e.*, the harassment was sufficiently severe or pervasive to alter the terms and conditions of plaintiff's employment and create a discriminatory abusive work environment — contains both an objective and subjective component.  To be actionable, a plaintiff must show not just that he subjectively believed the environment to be hostile or abusive, but that a reasonable person also would perceive it as such.  *See, e.g.*, *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993).  When evaluating the objective severity of the harassment, district courts must examine all of the circumstances, which may include such factors as:  the frequency of the discriminatory conduct; its severity; whether the conduct was physically threatening or humiliating, or merely an offensive utterance; and whether the conduct unreasonably interfered with the plaintiff's work performance.  *Id.* at 23; *see also, e.g., Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997).

A survey of the relevant legal authority demonstrates that the alleged race-based incidents identified by Penn as creating a hostile work environment do not rise to the requisite levels of severity or pervasiveness.  For example, in *Miller v.*

*Kenworth of Dothan, Inc.*, 277 F.3d 1269 (11th Cir. 2002), the Eleventh Circuit found that a racially hostile work environment existed where, on numerous times during a day, the foreman and others called plaintiff "Wetback," "Spic," and "Mexican Mother F-----," and used the derogatory terms "in an intimidating manner, shouting them at [plaintiff] during the course of berating him for his job performance or when they were 'arguing with him,' were 'mad with him,' or were 'taunting him . . . .'" *Id.* at 1276-77.  Similarly, in *Mack v. ST Mobile Aerospace Engineering, Inc.*, 195 Fed. Appx. 829 (11th Cir. 2006), the court held a jury question existed when there was evidence that racial graffiti permeated the workplace for many years; the plaintiffs discovered seven nooses in less than two years; management directed offensive words, jokes, and statements to minority employees; and employees were unable to perform their jobs effectively.  *Id.* at 837-38.  *See also Webb v. Worldwide Flight Service, Inc.*, 407 F.3d 1192, 1193 (11th Cir. 2005) (finding evidence sufficient for hostile work environment claim where supervisor referred to plaintiff on a daily basis for two years as a "nigger" and a "monkey," and described him as being "from the tribe"); *E.E.O.C. v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068-69 n.3 (11th Cir. 1990) (indicating that supervisor's racist slurs, including "niggers," "ignorant niggers," and "swahilis," and his statements that "blacks were meant to be slaves" and were of lower intelligence, and "[t]hose niggers out there will not get anywhere in this

37

company" created racially hostile work environment); *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) (concluding that "roughly fifteen separate instances of harassment over the course of four months" were actionably pervasive).

Where the type of conduct described in *Miller* and *Mack* has been implicated, but the conduct occurred less frequently, or was less widespread, or less offensive in nature, as is the case with Penn's claims, the Eleventh Circuit has found no racially hostile work environment.  In *Barrow v. Georgia Pacific Corp.,* 144 Fed. Appx. 54 (11th Cir. 2005), for example, the court concluded that "displays of the rebel flag on tool boxes and hard hats, the letters 'KKK' on a bathroom wall and on a block-saw console, and a noose in another employee's locker," as well as multiple threats to "kick [plaintiff's] 'black ass,'" together with the use of racial slurs including "nigger" and "black boy," reflected conduct that was "isolated," "sporadic," and "random" and did not amount to "severe and pervasive harassment."  *Id.* at 57-58.  Moreover, in *Washington v. Kroger Co.*, 218 Fed. Appx. 822 (11th Cir. 2007), the Eleventh Circuit found no racially hostile work environment when a co-worker allegedly hung a figurine representing the plaintiff by a rope and called the plaintiff racially-suggestive names, including "boy."  *Id.* at 825.  In *Smith v. Beverly Health and Rehabilitation Services, Inc.*, 978 F. Supp. 1116 (N.D. Ga. 1997), the district court concluded that

a supervisor's comments that "all that mooly can do is make coffee and bring it to me," "these goddamn Georgia niggers think they own Georgia," and "where I come from niggers knew their place," did not rise to the level of severe and pervasive racial harassment. *Id.* at 1122. Also, in *Quarles v. Con-Way Freight, Inc.*, No. 8:07-CV-200-T-27MAP, 2008 U.S. Dist. LEXIS 37747, at *1 (M.D. Fla. May 8, 2008), the Middle District of Florida, relying on *Barrow*, found that "six instances of racially-related conduct over a period of a few years," and "approximately four other instances that were reported to [plaintiff]" — which included a supervisor's use of racially offensive terms, using a stuffed animal gorilla to portray a black employee, and being told of a noose that had been shown to another black employee — fell "well short of the required level of severity and frequency to support a hostile environment claim." *Id.* at *6-7.

In light of the foregoing case law, Penn simply has not presented a triable issue with respect to whether he was subjected to severe or pervasive harassment. The record supports, at most, three race-related incidents over the course of fourteen months, none of which were initiated by management or supervisors. As such, the alleged harassment was "isolated," "sporadic," and "random." *See Barrow*, 144 Fed. Appx. at 57-58. Moreover, Penn has presented no evidence that he was subjected to conduct so severe as to pose an actual threat of physical harm, or to unreasonably

interfere with his work performance. *See Harris*, 510 U.S. at 23. Holland terminated the co-worker who made the racist slur during his argument with Penn.[217] Additionally, Holland initiated multiple investigations into the noose and grease incident, conducted mandatory training, and even installed video cameras to monitor the terminal in an effort to deter future misconduct.[218] Given this response, it is difficult to conceive that Penn felt threatened by the prospect of further racial harassment, or that these events unreasonably interfered with his work performance. The court, accordingly, must conclude that Penn has failed to show a genuine issue of material fact as to whether his workplace was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Miller*, 377 F.3d at 1275. Holland is, therefore, entitled to summary judgment on Penn's racially hostile work environment claims.

**B.   Penn's Disparate Treatment and Racial Discrimination Claims Under 42 U.S.C. § 1981 and Title VII**

Penn alleges that he was subjected to racial discrimination and disparate treatment under Title VII and § 1981. Title VII makes it unlawful for an employer

---

[217] Stephenson Affidavit, ¶ 13.

[218] *See* Blubaugh Deposition, at 196-97, 202, 211; Penn Deposition I, at 318-19; Stephenson Affidavit, ¶ 35; McKinney Affidavit, Exhibit A, at Exhibits 52, 56, 64.

to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1).  Under § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a).  Claims of race discrimination under 42 U.S.C. § 1981 are analyzed in the same manner as disparate treatment claims brought under Title VII.  *See Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 843 n.11 (11th Cir. 2000) ("The elements of a claim of race discrimination under 42 U.S.C. § 1981 are also the same as a Title VII disparate treatment claim in the employment context."); *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (noting that because Title VII and § 1981 have the same requirements of proof and use the same analytical framework, the court should analyze race discrimination claims under both laws simultaneously); *Lincoln v. Board of Regents of the University System of Georgia*, 697 F.2d 928, 935 n.6 (11th Cir. 1983) ("When . . . the plaintiff predicates liability under Title VII on disparate treatment, the legal elements of the claim are identical to those of a claim under § 1981.").

Where, as here, the plaintiff seeks to prove intentional discrimination by using

circumstantial evidence to show intent, the court must analyze the case using the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that familiar framework, the plaintiff bears the initial burden of presenting sufficient evidence to allow a reasonable fact-finder to determine that he has satisfied the elements of a *prima facie* case. *Id.* at 802. To make out a *prima facie* case of disparate treatment, the plaintiff can show that: (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) his employer treated similarly situated employees outside of his protected class more favorably than he was treated; and (4) he was qualified to perform the duties of his job. *Burke-Fowler v. Orange County, Florida*, 447 F.3d 1319, 1323 (11th Cir. 2006).

### 1.      Member of a protected class and job qualifications

The parties, at least implicitly, agree that Penn is qualified to perform the duties of his job, as well as a member of a protected class. As a current employee of Holland who has been with the company for several years, Penn is presumptively qualified for the position he occupies. *See Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001) (finding plaintiff's time in the job sufficient for the court to infer that plaintiff was qualified for the purpose of establishing *prima facie* case of racial discrimination). Thus, in determining whether Penn has established a *prima facie* case of racial discrimination and disparate treatment, the court need only address

whether Penn suffered an adverse employment action, and, if so, whether a similarly-situated, non-protected employee was treated more favorably.

## 2. Adverse employment action

Although the Eleventh Circuit has "not adopted a bright-line test for what kind of effect on the plaintiff's 'terms, conditions, or privileges' of employment the alleged discrimination must have for it to be actionable," it has clarified that "not all conduct by an employer negatively affecting an employee constitutes [an] adverse employment action." *Davis v. Town of Lake Park, Florida*, 245 F.3d 1232, 1238 (11th Cir. 2001). Indeed, "[a]lthough the statute does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Id.* at 1239. Thus, "an employee must show a serious and material change in the terms, conditions, or privileges of employment." *Id.* (emphasis omitted). "Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id.*

Holland argues that it is entitled to summary judgment because Penn did not suffer an adverse employment action.[219] In response, Penn, in kitchen-sink fashion,

---

[219] Doc. no. 47, at 31-32.

avers that the following incidents were adverse employment actions:

> [T]he March 12, 2007, termination which was converted to a three day suspension in lieu of termination; the June [1]2, 2007, termination of Penn's employment; the June 7, 2007, alteration of Penn's time card by Joey Norton which resulted in a loss of pay to Penn that was only corrected after a grievance was filed; the August, 2007, denial of work to Penn in favor of a less senior employee which resulted in a loss of pay to Penn and was only corrected after a grievance was filed; Norton's allowing white drivers to leave before the end of their shift and be paid while requiring Penn to stay; the August, 2007, termination of his employment; the November, 2007, and [sic] Norton's passing over of Penn for overtime which resulted in a loss of pay for Penn.[220]

Penn suffered no loss from the March 12, 2007 suspension, as it was waived before Penn lost any work time or money.[221]  Thus, it cannot be said that Penn suffered an adverse employment action with respect to this incident.  It is undisputed that Penn was fully compensated through the grievance process when Penn lost thirty minutes of pay after Norton signed him out manually on June 7, 2007, which was also the only incident supported by the record where Penn worked after his shift while a similarly situated white driver left early.[222]  Penn also successfully grieved the August 2007 occasion where Norton overlooked Penn and assigned a less senior employee work.[223] With respect to these and all other successfully grieved actions, Penn did not suffer

---

[220] Doc. no. 47, at 35.

[221] *See, e.g.*, McKinney Affidavit, Exhibit A, at Exhibit 4; Carl Deposition, at 109-11.

[222] Penn Deposition I, at 144, 151, 156-57; Carl Affidavit, ¶ 16.

[223] *See, e.g.*, Carl Affidavit, ¶ 21.

44

any change in his employment, let alone a serious and material change, and therefore, these did not constitute "adverse" employment actions. *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001) ("[T]he decision to reprimand or transfer an employee, *if rescinded before the employee suffers a tangible harm*, is not an adverse employment action." (emphasis supplied)); *Lindsey v. Burlington Northern Santa Fe Railway Company*, 266 F. Supp. 2d 1338, 1344 (N.D. Ala. 2003) (finding, in a discrimination case, that employee did not suffer an adverse employment action with respect to those incidents for which she was compensated after successfully filing a grievance); *Crittenden v. International Paper Company Wood Products Division*, 214 F. Supp. 2d 1250, 1253-54 (M.D. Ala. 2002) (finding "the relief [plaintiff] received as a result of the grievance process, including full reinstatement," sufficient to render an employment decision not adverse when it otherwise may have been).

Penn has produced scant evidence that Norton passed him over for overtime in November 2007, which consists of a brief, vague email exchange between Norton and Stephenson.[224]  Given that the email does not describe the amount of time of which Penn was supposedly deprived, and that the record contains no further mention of this matter, the court must conclude that there is insufficient evidence to establish

---

[224] *See* McKinney Affidavit, Exhibit A, at Exhibit 36.

that this constituted a serious and material change in the terms, conditions, or privileges of Penn's employment. Therefore, only two of Penn's alleged adverse employment actions remain potentially viable — the June and August 2007 terminations, which were ultimately downgraded to unpaid suspensions. Even though he was reinstated, Penn suffered at least some economic loss with respect to these terminations, and he was, therefore, arguably subject to an "adverse" employment action.

### 3. Non-protected, similarly situated employees treated more favorably

Regardless, Penn has failed to present sufficient evidence that Holland "treated similarly situated employees outside of his protected class more favorably than he was treated" in these termination-suspensions. *Burke-Fowler v. Orange County*, 477 F.3d 1319, 1323 (11th Cir. 2006). "In determining whether employees are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are *involved in or accused of the same or similar conduct* and are disciplined in different ways." *Maniccia v. Brown*, 171 F.3d 1364 (11th Cir. 1999) (emphasis supplied). The Eleventh Circuit requires "that the quantity and quality of the comparator's misconduct be *nearly identical* to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Burke-Fowler*, 477 F.3d at 1323 (quotation marks and citations omitted).

46

Viewing the evidence in the light most favorable to the plaintiff, Penn was terminated on June 12, 2007 due to his use of a cell telephone while working.  Penn received at least one written warning prior to the June 12, 2007 termination, and he admitted that he understood Holland's policy — no cell telephones for personal reasons — prior to this termination-suspension.[225]  It is undisputed that Norton observed Penn on his cell telephone at work in what appeared to be a continuous conversation that lasted at least thirty minutes.[226]  Holland has also presented undisputed evidence that Penn's cell phone was in use during his shift that night for approximately ninety-five minutes.[227]  In order to establish a *prima facie* case with respect to this particular allegedly adverse employment action, Penn must show that an employee outside his protected class was involved in or suspected of the same or "nearly identical" conduct, but disciplined in a different way.

To meet this burden, Penn relies on the deposition testimony of Holland supervisors Thomas Lightford, Tom Carl, and Ellen Conlin.  According to Thomas Lightford, he could vaguely remember verbally correcting employees who were talking on their cell telephones at work, but he could only recall one specific

---

[225] Penn Deposition I, at 170-73 & Exhibit 15.

[226] Norton Deposition, at 87-93.

[227] Blubaugh Affidavit, ¶ 19, Exhibit 2; Penn Deposition II, at 9.

instance.[228]  That instance involved another employee who, like plaintiff, was black, but who informed Lightford *before taking a call* regarding a family member.  That call, according to Lightford, lasted only ten or eleven minutes.[229]  Former Terminal Manager Tom Carl merely testified that he did not write up employees who were on their cell telephones for "one minute."[230]  Ellen Conlin testified only that she recalled three white employees, along with a minority employee, who briefly violated the cell telephone policy and received only a verbal warning.[231]  Penn has not produced evidence that any employee, whether protected or unprotected,  with at least one prior warning was not terminated after management observed him or her violating the company's policy for what appeared to be more than "one minute."  Morever, Penn spent one and a half hours on the telephone that night while on the clock, and Penn had an already-established disciplinary history with Holland that was unrelated to the cell telephone policy.  Nothing in the testimony of Conlin, Lightford, or Carl indicates that a non-protected employee engaged in conduct nearly identical to Penn's, either in quantity or quality, and any finding otherwise by this court would be a confusion of apples with oranges.  *See Burke-Fowler*, 477 F.3d at 1323.  Penn's

---

[228] Lightford Deposition, at 24-25.

[229] *Id.* at 54-56, 65.

[230] Carl Deposition, at 134.

[231] Conlin Deposition, at 36-41.

evidence is insufficient to establish a *prima facie* case of disparate treatment and racial discrimination with respect to his June 12, 2007 termination-suspension.

The same is true regarding the only remaining adverse employment action in consideration, Penn's August termination-suspension.  Even though the facts of the August 8, 2007 termination are disputed, Penn does not deny that he refused repeated requests by Conlin to enter the office, and that he, consequently, was terminated.[232]  Moreover, Penn had a disciplinary track record with Holland by this time.  As grounds for termination, Holland cited Penn's failure to follow a reasonable work request, *i.e.*, he would not enter Ellen Conlin's office when asked to do so multiple times.  At the very least then, Penn must present evidence that a non-protected employee with some history of disciplinary problems was suspected of failing to follow a reasonable work request and was not terminated.  In an effort to do so, Penn relies on his affidavit testimony, which was submitted in response to Holland's motion for summary judgment.  In conclusory fashion, Penn stated: "A driver has never been refused a witness when requesting one."[233]  Penn asserts that this statement "show[s] that he was treated differently," because he alleges that his termination was due to his request for a witness before entering the office — a

---

[232] Penn Deposition I, at 229-33; Penn Affidavit, Exhibit A.
[233] Penn Affidavit, Exhibit A.

request which, paradoxically, he allegedly needed because he feared termination.[234]

Putting aside the question of whether Penn's statement is relevant at all to the present matter, it is inadmissible evidence. Penn has made no attempt to demonstrate that he has the personal knowledge necessary to support the proposition that "[a] driver has never been refused a witness when requesting one."[235]   Accordingly, Penn has presented insufficient evidence of comparators regarding his August 8, 2007 termination. *See Burke-Fowler*, 477 F.3d at 1323. "[A]bsent some other similarly situated but differently disciplined worker, there can be no disparate treatment." *Abel v. Dubberly*, 210 F.3d 1334, 1339 (11th Cir. 1999) (citing *Jones v. Gerwens*, 874 F.2d 1534 (11th Cir. 1989)). Penn has failed to establish a *prima facie* case of disparate treatment and racial discrimination, and Holland is, therefore, entitled to summary judgment on these claims.

## C.    Penn's Retaliation Claims Under 42 U.S.C. § 1981 and Title VII

Penn alleges that, in retaliation for his repeated complaints of discriminatory treatment, Holland subjected Penn to, "among other things, terminations, written warnings, calls to his home while he was on duty, surveillance, and denial of work he was entitled to."[236]   Holland contends that it is entitled to summary judgment

---

[234] Doc. no. 47, at 36.

[235] Penn Affidavit, Exhibit A.

[236] Doc. no. 47, at 44.

because Penn cannot establish a causal connection between his engaging in protected activity and any challenged employment action.[237]  Moreover, Holland argues that all adverse employment actions taken against Holland were for legitimate, non-discriminatory, and non-retaliatory business reasons.[238]

1.     *Prima facie* **case**

To establish a claim of retaliation under Title VII or § 1981, a plaintiff must prove that (1) he engaged in statutorily protected activity, (2) he suffered a materially adverse action, and (3) there was some causal relation between the two events. *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (citing *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006)).  After a plaintiff establishes a *prima facie* case, the employer must proffer a legitimate, nondiscriminatory and non-retaliatory reason for the adverse employment action. *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997).  If the employer offers legitimate reasons for the employment action, the plaintiff must then demonstrate that the employer's proffered explanation is pretext for discrimination or retaliation.  *Id.* "The plaintiff must meet the reason proffered head on and rebut it." *Crawford v. City of Fairburn*, 482 F.3d 1305, 1308 (11th Cir. 2007).

a.     **Protected activity**

---

[237] Doc. no. 39, at 2.

[238] *Id.*

Under the Opposition Clause of Title VII, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Title VII's Participation Clause provides that an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Id.* The Participation Clause protects "proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC." *EEOC v. Total System Service, Inc.*, 221 F.3d 1171, 1174 (11th Cir.2000).

It is clear that Penn engaged in conduct protected by both the Opposition and Participation Clauses. Penn filed numerous grievances through his union, confronted Holland leadership on multiple occasions, filed two EEOC complaints, and, on several occasions, contacted Holland's Human Resources personnel, Stephen Blubaugh and Stacey VandeVusse. Penn's first actual complaint of *discrimination* occurred in June 2007, when he spoke to Blubaugh and alleged "racial discrimination, retaliation and racial harassment at the terminal."[239] Additionally, on August 3, 2007,

---

[239] Penn Deposition I, at 198.

52

Penn contacted Blubaugh and claimed that Norton was discriminating against him, alleged that Norton yelled at him on the radio in front of a customer, and also reported the incident where Norton manually clocked Penn out thirty minutes early.[240]  For a second time on August 3, 2007, and then again on August 7, 2007, Penn contacted Blubaugh to further complain about the same issues.[241]  Although there are other occasions on which Penn engaged in protected activity, the June and August 2007 complaints, as explained below, are the only incidents of protected activity that are even arguably connected causally to an adverse employment action suffered by Penn.

### b.    Adverse employment action and causation

Title VII's protection against retaliatory discrimination extends to adverse actions which fall short of ultimate employment decisions.  *Wideman v. Wal-Mart Stores, Inc*., 141 F.3d 1453, 1456 (11th Cir. 1998).  However, in order to sustain a Title VII retaliation claim, an employee must show that "a reasonable employee would have found the challenged action materially adverse," such that the action would "dissuade[ ] a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006).  "[T]rivial harms" and "petty slights" do not constitute adverse

---

[240] *See, e.g.*, Penn Deposition I, at 228; Blubaugh Deposition, at 101-106; Norton Deposition, at 123-24.

[241] McKinney Affidavit, Exhibit A, at Exhibit 23.

53

employment actions.  *Id.*

The court is compelled to point out that no action by Holland has dissuaded Penn from continually voicing his complaints, both formally and informally.  Indeed, the record is essentially a Gordian Knot of what Penn would call adverse employment actions followed by some kind of challenge by Penn.  Nevertheless, Penn argues that the following employment actions were adverse for the purposes of establishing his retaliation claim:  (1) the July 12 and August 8, 2007 terminations; (2) myriad written warnings issued by Holland supervisors; (3) Ellen Conlin's telephone call to his home while Penn was on duty; (4) Holland's surveillance of Penn; and (5) Joey Norton's act of bypassing Penn's seniority in a work assignment.[242]  The written warning letters would not dissuade a reasonable worker from making a charge of discrimination, and they did not dissuade Penn as he continued to file grievances for many of the warning letters he received from Holland.  *See Bush v. Regis Corp.*, 257 Fed. Appx. 219, 222 (11th Cir. 2007) (finding warning letters, among other things, insufficient to establish adverse employment action under newly articulated *Burlington* standard).  Penn's claim that a telephone call to his home from a Holland manager who was attempting to locate Penn constituted a materially adverse employment action borders on the absurd.  Any harm that conceivably came from Holland's surveillance of Penn, which

---

[242] Doc. no. 47, at 44.

the record indicates was conducted in order to determine whether Penn was doing the job for which he was paid, could not be viewed as materially adverse by a reasonable employee.  In fact, Penn could not have suffered harm with respect to the April 2007 surveillance, as he claims Carl did not tell him about it.[243]   Later, Penn merely had suspicions that he was under surveillance.[244]   The thirty minutes of pay lost by Penn when Norton manually clocked Penn out was no more than a "trivial harm" or "petty slight" and, regardless, Penn was fully compensated for the time after he brought it to Holland's attention and, therefore, suffered no financial harm.  The only two remaining employment actions upon which Penn may establish a *prima facie* case of retaliation are his June 12 and August 8, 2007 terminations, both of which were reduced to unpaid suspensions.  The court is satisfied that a termination of employment, even if reduced to an unpaid suspension, is a materially adverse action that could dissuade a reasonable employee from engaging in protected conduct.

Holland argues that it is, nevertheless, entitled to summary judgment because Penn cannot establish a causal connection between any of his protected conduct and his terminations.  Indeed, a plaintiff must establish a causal connection between his

---

[243] Penn Affidavit, ¶ 10.

[244] *See, e.g.*, McKinney Affidavit, Exhibit A, at Exhibit 39 (grievance filed by Penn) (rationalizing that the only way that Shane Luker could have discovered Penn's location was through electronic surveillance and stating "[e]lectronic surveillance being used against a [sic] employee is an illegal act.").

statutorily protected conduct and the adverse employment action complained of in order to prevail on a retaliation claim. *See Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993). A plaintiff may establish the requisite causal connection by showing "that the protected activity and the adverse action were not wholly unrelated." *Simmons v. Camden County Board of Education*, 757 F.2d 1187, 1189 (11th Cir. 1985). "At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action. The defendant's awareness of the protected statement, however, may be established by circumstantial evidence." *Goldsmith*, 996 F.2d at 1163 (citations omitted).

Addressing the June 12, 2007 termination that was subsequently converted to a suspension, Holland argues that Penn had not engaged in protected conduct on or prior to that date.[245] Holland contends that there can be no causal connection when the adverse employment action occurred prior to protected activity. *See Byrne v. Alabama Alcoholic Beverage Control Board*, 635 F. Supp. 2d 1281, 1300 (M.D. Ala. 2009) ("[E]vidence of an employer's concerns about an employee's performance before the employee's protected activity undercuts a finding of causation . . . ."). While Holland's proposition of law is correct, the contention that Penn had not

---

[245] Doc. no. 39, at 44.

previously engaged in protected activity is not.  The record establishes, through

Penn's testimony, that Penn alleged discriminatory treatment in a conversation with

Holland's Vice President of Human Resources, Stephen Blubaugh, in "approximately

June of 2007."[246] Even so, the record does not contain evidence that anyone at the

Decatur Terminal had knowledge of Penn's protected activity when Outbound

Supervisor Joey Norton terminated his employment on June 12, 2007.  *See*

*Goldsmith*, 996 F.2d at 1163 ("*At a minimum*, a plaintiff must generally establish that

the employer was actually aware of the protected expression at the time it took

adverse employment action." (emphasis supplied)).  Moreover, there is no evidentiary

dispute that:  Penn had previously received a written warning regarding the use of his

cell telephone while working; that he knew he was not to use that telephone for

personal reasons while working; and that Penn was, in fact, using his cell telephone

while working that night.  Even if Penn were to produce evidence that Norton knew

of his complaint of discrimination, Penn's misconduct severed the causal chain.  *See*

*Fleming v. Boeing Co.*, 120 F.3d 242, 248 (11th Cir. 1997) (holding that plaintiff's

failure to meet the performance standards set by the employer broke the causal

connection between any protected activity and adverse employment action); *see*, *e.g.*,

*Hankins v. AirTrans Airways, Inc*., 237 Fed. Appx. 513, 520-21 (11th Cir. 2001)

---

[246] Penn Deposition I, at 198.

(finding plaintiff's "intervening act of misconduct" as severing the causal connection between protected activity and adverse employment action that occurred five days thereafter).   Accordingly, Penn has not established a *prima facie* case of retaliation with respect to the July 12, 2007 termination.

Next addressing the August 8, 2007 termination, Holland argues that, when Supervisor Ellen Conlin terminated Penn's employment, just after Penn engaged in protected activity on August 3 and 7, 2007, she was not aware of Penn's protected activity and, therefore, no causal link can be established.[247]   In response, Penn produced an email between Human Resources Vice President Stephen Blubaugh and Terminal Manager Tom Carl that bears directly on Holland's argument.   In responding to Blubaugh's August 7, 2007 request for information regarding Carl's investigation into Penn's discrimination complaint, Carl stated:

> I called Joey Norton after we spoke on 8/2 or 8/3 2007 and asked him why he dispatched around Mr. Penn.  He stated that he had given a pick up . . . to [Penn] earlier and [Penn] was unable to pick it up because he did not have a pallet jack. [Norton] later sent a casual over to get it and did not realize that [Penn] was still on the dock.  I asked Ellen Conlin if that was a true statement, and she said that it was an honest mistake and [Norton] acknowledged that he had errored [sic]. . . .[248]

Giving Penn the reasonable inferences to which he is entitled at the summary judgment stage, the contents of this email establish that Carl, Conlin, and Norton had

---

[247] Doc. no. 39, at 45.

[248] McKinney Affidavit, Exhibit A, at Exhibit 36.

knowledge of Penn's complaint of discrimination prior to the August 8, 2007 termination.  The email suggests that Carl spoke with both Conlin and Norton  well before August 8, 2007.  Blubaugh's notes indicate that Penn's early August 2007 complaint was the first time Penn actually  used the word "discrimination."[249]  The proximity of time between this event and Penn's termination provides further evidence supporting a causal connection between Penn engaging in protected conduct and the adverse employment action.  *See Thomas v. Cooper Lightning, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007); *see also, e.g.*, *Entrekin v. City of Panama City*, 376 Fed. Appx. 987, 997 (11th Cir. 2010) (finding that plaintiff established a *prima facie* case of retaliation based "solely on the 'very close' proximity between the [plaintiff's] filing of the lawsuit . . . and the termination [of the plaintiff] just over two weeks later.").  The court, accordingly, is satisfied that Penn has established a *prima facie* case of retaliation, but only with respect to the August 8, 2007 termination.

## 2.    Legitimate, non-discriminatory, and  non-retaliatory reason for termination

Because a *prima facie* case is deemed to have been established, the burden shifts to Holland to rebut the resulting presumption of discrimination by producing evidence that it acted for a  legitimate, non-discriminatory reason.  *McDonnell Douglas*, 411 U.S. at 802.  This burden is "exceedingly light."  *Meeks v. Computer*

---

[249] Blubaugh Deposition, at 109-10; McKinney Affidavit, Exhibit A, at Exhibit 23.

*Associates, International*, 15 F.3d 1013, 1021 (11th Cir. 1994).  Holland need not

persuade this court that it was actually motivated by the proffered reason, but need

only present evidence raising a genuine issue of fact as to whether it discriminated

against Penn.  *Texas Department of Community Resources v. Burdine*, 450 U.S. 248,

254 (1981).  However, Holland's response must "frame the factual issue with

sufficient clarity so that the plaintiff will have a full and fair opportunity to

demonstrate pretext."  *Id.* at 255-56.

The court is satisfied that Holland has met its "exceedingly light" burden of

articulating a legitimate, non-discriminatory and non-retaliatory reason for its

termination of Penn on August 8, 2007.  According to both Ellen Conlin and Joey

Norton, the Decatur Terminal changed its work procedures two weeks prior to Penn's

termination.[250]  Conlin testified that she informed all employees about the new policy,

including Penn.[251]  Pursuant to the change, employees performing dock work were to

pick-up and drop-off freight bills from the terminal office, instead of the "dispatch

window," which was the previous custom.[252]  According to Conlin, Penn refused to

come into the office upon her repeated requests.[253]  Just before walking away, Penn

---

[250] Conlin Affidavit, ¶ 2; Conlin Deposition, at 92-93; Norton Deposition, at 41-43, 127-29.

[251] Conlin Deposition, at 92-93, 100-01.

[252] *Id.*

[253] Conlin Deposition, at 94-98, Exhibit 5 (email written from Conlin to various terminal supervisors on August 8, 2007).

allegedly stated to Conlin something to the effect of: "If you want to give me some work, you know where to find me."[254]  Conlin testified that she then went out to Penn on the dock and requested that he come into the office to obtain freight bills after he finished his current task.[255] Penn, again, allegedly refused to come into the office, and sought to retrieve the freight bills from the dispatch window.[256]  According to Conlin, she again asked Penn to come into the office to pick up freight bills — at which point, according to Conlin, Penn "puffed up his chest and stated that he was not coming into the office[, and] if [Conlin] wanted him to work she needed to give him the bills his way."[257]  Much of the deposition testimony of Conlin and Norton — including the policy change — is corroborated by an email created the night of Penn's termination.[258]  Accordingly, Holland has articulated a legitimate, non-discriminatory, and non-retaliatory reason for terminating Penn's employment: "Holland terminated Penn on August 8, 2007 when he refused repeated requests by Conlin to obtain freight bills from the terminal office pursuant to a corporate-wide procedure."[259]

### 3.    Pretext

---

[254] *Id.*

[255] Conlin Deposition, at 96-97 & Exhibit 5.

[256] *Id.*

[257] *Id.*

[258] *See* Conlin Deposition, Exhibit 5.

[259] Doc. no. 39, at 34.

Once the employer meets its burden of articulating a legitimate, non-retaliatory reason for the challenged employment action, the presumption of retaliation drops from the case, and the plaintiff must demonstrate that the employer's reasons are a "'pretext for prohibited retaliatory conduct.'" *See Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 507 n.6 (11th Cir. 2000). An employee may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find [those reasons] unworthy of credence." *Silvera v. Orange County School Board*, 244 F.3d 1253, 1258 (11th Cir. 2001).

Penn's evidence of pretext is insufficient to allow him to take his case to a jury. Penn's evidence is his own testimony, most of which is in the form of an affidavit submitted after Holland moved for summary judgment.[260] Penn's version of the events of August 8, 2007 are vastly different from the version articulated by Holland. In spite of the contents of the August 8, 2007 email from Conlin to the terminal leadership, and without regard to the testimony of both Norton and Conlin, Penn submits a blanket denial that any new policy was properly in place at the Decatur

---

[260] Penn Affidavit, Exhibit A.

Terminal.[261]  Penn claims that he had never been in the office to collect freight bills before,[262] and that Conlin approached him on the dock to "ask what [he] was doing."[263]  At this point, Penn "felt something wasn't right," and he stated that Conlin's "tone was hostile when she asked [him] to come into the office."[264]  Despite the fact that at least four other employees were present, including Byron McKelvey, Penn claims that he "told [Conlin] that [he] needed a witness before [going] into the office."[265]  Penn then admittedly left the readily available group of witnesses, only to later have one of that group, Byron McKelvey, find him, remind Penn that he was wanted in the office, and volunteer to serve as his witness.[266]  Regarding the reason for his termination, Penn stated as follows:

> [Conlin] attempted to take away my employment in a [sic] act of retaliation.  I was terminated because I requested a witness to be present in an environment of hostility.  I asked the labor (company) manager if he was in my position would he have gone in that office by himself, if he was in my shoes at that time as I had described.  He responded, "A hypothetical question, deserves a hypothetical answer, I don't know if I would or not."[267]

---

[261] Penn Deposition I, at 229-30.  Penn's assertion that he was not allowed in the office is a curious one, as Penn testified that he entered the office on the evening of his June 12, 2007 termination-suspension.  *See* Penn Deposition I, at 181-82.

[262] Penn Affidavit, Exhibit A.

[263] *Id.*

[264] *Id.*

[265] *Id.*

[266] *Id.*

[267] Penn Affidavit, Exhibit A.

The only "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" demonstrated by Penn's evidence are those in his own testimony.  It is difficult to conceive precisely why Penn would need to decline to enter the office and leave the area to find a witness when it is undisputed that witnesses were already present when Penn supposedly informed Conlin of his need for one.  Moreover, Penn's testimony is contradictory in that he claims he was terminated because he wanted a witness, yet he only wanted a witness present because he felt his job was in danger.[268]  The court is unconvinced that a reasonable factfinder could conclude, without more evidence, that Norton and Conlin conspired to fabricate a fake company policy in an attempt to justify a retaliatory termination of Penn.  The record is replete with incidents for which Penn could have been terminated without invoking the protection of Title VII or § 1981, and Holland, therefore, had no need to invent one.  Regardless, even in accepting Penn's version of the story as true, Penn has failed to demonstrate pretext.  The Eleventh Circuit has  been clear in its refusal to act "as a super-personnel department that reexamines an entity's business decisions" and, accordingly, this court's inquiry is limited to "whether the employer gave an honest explanation of its behavior."  *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*).  Thus, even where an employee proves that "he did not, in fact,

---

[268] Penn Affidavit, Exhibit A; *see also* Penn Deposition I, at 233.

commit the violation with which [he] is charged, an employer successfully rebuts any prima facie case of disparate treatment by showing it honestly believed the employee committed the violation." *Jones v. Gerwins*, 874 F.2d 1534, 1540 (11th Cir. 1989). Holland demonstrated its honest belief that Penn violated a work rule through the deposition testimony of Conlin, Norton, and a corroborating email that was created the night of the event.[269]   Penn's much later testimony is insufficient to raise a question regarding Holland's honest belief.  Accordingly, Penn has failed to produce sufficient evidence of pretext and Holland is entitled to summary judgment on Penn's retaliation claims.

## IV. CONCLUSION AND ORDER

In conclusion, plaintiff would be well-advised to remember that neither "every unkind act,"[270] nor "everything that makes an employee unhappy,"[271] amounts to an actionable, *adverse* employment action under the federal employment discrimination statutes.  "Otherwise," as is clearly demonstrated by the events complained of in the present case, "every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit."  *Williams v.*

---

[269] Conlin Deposition, at 92-97 & Exhibit 5; Norton Deposition, at 125-28.

[270] *Doe v. Dekalb County School District*, 145 F.3d 1441, 1449 (11th Cir. 1998) (quoting *Wu v. Thomas*, 996 F.2d 271, 273 n.3 (11th Cir. 1993) (*per curiam*)).

[271] *Doe*, 145 F.3d at 1450 (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)); *see also Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996) ("not everything that makes an employee unhappy is an actionable adverse action.").

*Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996) (Posner, C.J.) (*quoted with approval in Doe v. Dekalb County School District*, 145 F.3d 1441, 1449 (11th Cir. 1998)).

In any event, following consideration of the pleadings, motions, and evidentiary submissions, it is ORDERED, ADJUDGED, and DECREED that defendant's motion for summary judgment be, and the same hereby is, GRANTED, and *all* of plaintiff's claims are DISMISSED *with prejudice*. It is further ORDERED that plaintiff's motion to strike be, and the same hereby is, DENIED as moot. *Costs are taxed to plaintiff*. The Clerk is directed to close this file.

DONE and ORDERED this 16th day of November, 2010.

_____
United States District Judge